1

2

3

4

5

6

7

8        IN THE UNITED STATES DISTRICT COURT

9        FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ZENAWE MEHARI,

11           Plaintiff,              No. CIV S-08-1089 MCE DAD P

12       vs.

13   R.V. COX, et al.,

14           Defendants.            FINDINGS AND RECOMMENDATIONS

15   _____/

16           Plaintiff is a state prisoner proceeding pro se with a civil rights action seeking

17   relief under 42 U.S.C. § 1983.  This matter is before the court on a motion for summary

18   judgment brought on behalf of defendants Cox, James, and Flaherty.  Plaintiff has filed an

19   opposition to the motion, and defendants have filed a reply.

20                           **BACKGROUND**

21           Plaintiff is proceeding on his original complaint against defendants Cox, James,

22   and Flaherty.  Therein, he alleges as follows.  On November 2, 2005, plaintiff began

23   experiencing extreme lower-back pain that affected his daily movement and functioning.  On

24   November 29, 2005, plaintiff was transferred to High Desert State Prison ("HDSP") where he

25   sought medical treatment from the defendants on numerous occasions.  According to plaintiff,

26   the defendants refused to authorize him for a Magnetic Resonance Image ("MRI") or provide

1

1  him with appropriate referrals to outside back specialists.  Plaintiff claims that the defendants

2  have denied him adequate medical care in violation of the Eighth Amendment and requests

3  compensatory and punitive damages.  (Compl. at 3 & Attach. 1-26.)

4  **SUMMARY JUDGMENT STANDARDS UNDER RULE 56**

5          Summary judgment is appropriate when it is demonstrated that there exists "no

6  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

7  matter of law."  Fed. R. Civ. P. 56(c).

8          Under summary judgment practice, the moving party
           always bears the initial responsibility of informing the district court
9          of the basis for its motion, and identifying those portions of "the
           pleadings, depositions, answers to interrogatories, and admissions
10         on file, together with the affidavits, if any," which it believes
           demonstrate the absence of a genuine issue of material fact.

11

12  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

13  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

14  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

15  to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

16  after adequate time for discovery and upon motion, against a party who fails to make a showing

17  sufficient to establish the existence of an element essential to that party's case, and on which that

18  party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

19  concerning an essential element of the nonmoving party's case necessarily renders all other facts

20  immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as

21  whatever is before the district court demonstrates that the standard for entry of summary

22  judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

23          If the moving party meets its initial responsibility, the burden then shifts to the

24  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

25  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

26  establish the existence of this factual dispute, the opposing party may not rely upon the

2

1   allegations or denials of its pleadings but is required to tender evidence of specific facts in the

2   form of affidavits, and/or admissible discovery material, in support of its contention that the

3   dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

4   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

5   of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

6   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

7   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

8   return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

9   1436 (9th Cir. 1987).

10          In the endeavor to establish the existence of a factual dispute, the opposing party

11  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

12  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

13  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

14  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

15  genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

16  committee's note on 1963 amendments).

17          In resolving the summary judgment motion, the court examines the pleadings,

18  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

19  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

20  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

21  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

22  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

23  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

24  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

25  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

26  show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

3

1   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

2   'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

### OTHER APPLICABLE LEGAL STANDARDS

4   I.  Civil Rights Act Pursuant to 42 U.S.C. § 1983

5       The Civil Rights Act under which this action was filed provides as follows:

6           Every person who, under color of [state law] . . . subjects, or causes
            to be subjected, any citizen of the United States . . . to the
7           deprivation of any rights, privileges, or immunities secured by the
            Constitution . . . shall be liable to the party injured in an action at
8           law, suit in equity, or other proper proceeding for redress.

9   42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

10  actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

11  Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362

12  (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the

13  meaning of  § 1983, if he does an affirmative act, participates in another's affirmative acts or

14  omits to perform an act which he is legally required to do that causes the deprivation of which

15  complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

16      Moreover, supervisory personnel are generally not liable under § 1983 for the

17  actions of their employees under a theory of respondeat superior and, therefore, when a named

18  defendant holds a supervisorial position, the causal link between him and the claimed

19  constitutional violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862

20  (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory

21  allegations concerning the involvement of official personnel in civil rights violations are not

22  sufficient.  See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).

23  II.  The Eighth Amendment and Inadequate Medical Care

24      The unnecessary and wanton infliction of pain constitutes cruel and unusual

25  punishment prohibited by the Eighth Amendment.  Whitley v. Albers, 475 U.S. 312, 319 (1986);

26  Ingraham v. Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).

In order to prevail on a claim of cruel and unusual punishment, a prisoner must allege and prove that objectively he suffered a sufficiently serious deprivation and that subjectively prison officials acted with deliberate indifference in allowing or causing the deprivation to occur.  Wilson v. Seiter, 501 U.S. 294, 298-99 (1991).

Where a prisoner's Eighth Amendment claims arise in the context of medical care, the prisoner must allege and prove "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Estelle, 429 U.S. at 106.  An Eighth Amendment medical claim has two elements:  "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need."  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1991), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

A medical need is serious "if the failure to treat the prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'"  McGuckin, 974 F.2d at 1059 (quoting Estelle, 429 U.S. at 104).  Indications of a serious medical need include "the presence of a medical condition that significantly affects an individual's daily activities."  Id. at 1059-60.  By establishing the existence of a serious medical need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).

If a prisoner establishes the existence of a serious medical need, he must then show that prison officials responded to the serious medical need with deliberate indifference.  Farmer, 511 U.S. at 834.  In general, deliberate indifference may be shown when prison officials deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in which prison officials provide medical care.  Hutchinson v. United States, 838 F.2d 390, 393-94 (9th Cir. 1988).  Before it can be said that a prisoner's civil rights have been abridged with regard to medical care, however, "the indifference to his medical needs must be substantial.  Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."

1  Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at

2  105-06).  See also Toguchi v. Soon Hwang Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere

3  negligence in diagnosing or treating a medical condition, without more, does not violate a

4  prisoner's Eighth Amendment rights."); McGuckin, 974 F.2d at 1059 (same).  Deliberate

5  indifference is "a state of mind more blameworthy than negligence" and "requires 'more than

6  ordinary lack of due care for the prisoner's interests or safety.'"  Farmer, 511 U.S. at 835

7  (quoting Whitley, 475 U.S. at 319).

8          Delays in providing medical care may manifest deliberate indifference.  Estelle,

9  429 U.S. at 104-05.  To establish a claim of deliberate indifference arising from delay in

10 providing care, a plaintiff must show that the delay was harmful.  See Berry v. Bunnell, 39 F.3d

11 1056, 1057 (9th Cir. 1994); McGuckin, 974 F.2d at 1059; Wood v. Housewright, 900 F.2d 1332,

12 1335 (9th Cir. 1990); Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989); Shapley v.

13 Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985).  In this regard, "[a]

14 prisoner need not show his harm was substantial; however, such would provide additional

15 support for the inmate's claim that the defendant was deliberately indifferent to his needs."  Jett

16 v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).  See also McGuckin, 974 F.2d at 1060.

17         Finally, mere differences of opinion between a prisoner and prison medical staff

18 or between medical professionals as to the proper course of treatment for a medical condition do

19 not give rise to a § 1983 claim.  Toguchi, 391 F.3d at 1058; Jackson v. McIntosh, 90 F.3d 330,

20 332 (9th Cir. 1996); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Franklin v. Oregon, 662

21 F.2d 1337, 1344 (9th Cir. 1981).

22 III.  Qualified Immunity

23         "Government officials enjoy qualified immunity from civil damages unless their

24 conduct violates 'clearly established statutory or constitutional rights of which a reasonable

25 person would have known.'"  Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001) (quoting

26 Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  When a court is presented with a qualified

immunity defense, the central questions for the court are (1) whether the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the defendant's conduct violated a statutory or constitutional right and (2) whether the right at issue was "clearly established." Saucier v. Katz, 533 U.S. 194, 201 (2001).

Although the court was once required to answer these questions in order, the United States Supreme Court has recently held that "while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory." Pearson v. Callahan, __ U.S. __, __, 129 S. Ct. 808, 818 (2009). In this regard, if a court decides that plaintiff's allegations do not make out a statutory or constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201. Likewise, if a court determines that the right at issue was not clearly established at the time of the defendant's alleged misconduct, the court may end further inquiries concerning qualified immunity at that point without determining whether the allegations in fact make out a statutory or constitutional violation. Pearson, 129 S. Ct. at 818-21.

In deciding whether the plaintiff's rights were clearly established, "[t]he proper inquiry focuses on whether 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted' . . . or whether the state of the law [at the relevant time] gave 'fair warning' to the officials that their conduct was unconstitutional." Clement v. Gomez, 298 F.3d 898, 906 (9th Cir. 2002) (quoting Saucier, 533 U.S. at 202). The inquiry must be undertaken in light of the specific context of the particular case. Saucier, 533 U.S. at 201. Because qualified immunity is an affirmative defense, the burden of proof initially lies with the official asserting the defense. Harlow, 457 U.S. at 812; Houghton v. South, 965 F.2d 1532, 1536 (9th Cir. 1992); Benigni v. City of Hemet, 879 F.2d 473, 479 (9th Cir. 1989).

/////

/////

/////

7

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I.   Defendants' Statement of Undisputed Facts and Evidence

Defendants' statement of undisputed facts is supported by citations to declarations signed under penalty of perjury by defendant Cox, defendant James, defendant Flaherty, and Dr. B. Shiller.  It is also supported by citations to copies of plaintiff's medical records, inmate appeals, and health care services request forms.

The evidence submitted by the defendants establishes the following.  From November 2005 to November 2007, plaintiff was an inmate in custody at HDSP.  At all relevant times, defendants Cox and James were licensed medical doctors at HDSP, and defendant Flaherty was a registered nurse ("RN") at HDSP.  (Defs.' SUDF 1-4, Exs. A-D.)

On January 6, 2006, defendant Cox examined plaintiff in response to his complaints regarding back pain.  During the examination, defendant Cox noticed some minimal tenderness in plaintiff's lumbrosacral area.  He prescribed plaintiff Motrin for pain, ordered an x-ray of his spine, instructed plaintiff regarding the use of Motrin, and encouraged plaintiff to take walks and hot showers.  (Defs.' SUDF 5-7, Exs. A-B.)

In 2006, if an inmate at HDSP wanted medical services, he would submit a health care services request form for collection by a health care staff member.  Qualified medical personnel reviewed the health care services request forms and scheduled inmates for triage appointments with an RN.  The RN would visit the inmate and follow the appropriate protocol according the inmate's presenting symptoms.  Depending on the symptoms, the RN might provide the inmate with over-the-counter medications and refer the inmate to a clinic physician. Inmates who frequently saw the triage RN may already have had scheduled appointments with a clinic physician.  The triage RN could not refer inmates to outside physicians or facilities.  The triage RN could only refer inmates to the on-call physician at HDSP.  At the time plaintiff saw defendant Flaherty, the triage RN could only call the on-call physician if there was an emergency. The triage RN had no control over whether an inmate actually saw a staff physician.  The triage

8

1  RN did not schedule appointments for inmates to see staff physicians.  (Defs.' SUDF 8-16, Ex.

2  D.)

3                 On January 22, 2006, plaintiff submitted a health care services request form

4  complaining of back pain.  On January 26, 2006, defendant Flaherty examined plaintiff at a triage

5  appointment.  Defendant Flaherty gave plaintiff Naproxen for his pain and told him to resubmit

6  another request for an appointment if it did not help.  On April 5, 2006, plaintiff submitted a

7  another health care services request form complaining about lower back pain.  On April 8, 2006,

8  defendant Flaherty examined plaintiff again and told him that he had been scheduled for a

9  doctor's appointment on April 14, 2006.  Defendant Flaherty wrote "resolved" on plaintiff's

10  April 5, 2006, health care services request form because plaintiff was scheduled for an

11  appointment with a doctor.  (Defs.' SUDF 17-22, Exs. A & D.)

12                 On April 19, 2006, defendant Cox met with plaintiff to discuss the results of the

13  x-ray of his back.  He told plaintiff that the radiologist who reviewed the x-ray noted that there

14  was mild intervertebral disc space narrowing present at his L4 and L5 vertebrae and that the

15  radiologist stated that an MRI might be helpful for further evaluation as clinically indicated.

16  Defendant Cox then ordered an MRI for plaintiff's spine and prescribed him Naprosyn, an anti-

17  inflammatory drug used to treat pain.  (Defs.' SUDF 23-25, Exs. A-B.)

18                 In 2006, the Medical Authorization Review ("MAR") Committee at HDSP

19  reviewed and approved all MRI requests by staff physicians.  The MAR Committee was

20  comprised of the Chief Medical Officer of the prison, all physicians at the prison, and two nurse

21  practitioners.  Decisions on whether to approve MRI requests were by majority vote.  Defendant

22  Cox was a member of the MAR Committee.  (Defs.' SUDF 26-29, Ex. B.)

23                 On May 1, 2006, the majority of the MAR Committee voted to deny defendant

24  Cox's request for an MRI and suggested that plaintiff first see the physical therapy department

25  for treatment.  Defendant Cox voted in favor of plaintiff receiving the MRI.  (Defs.' SUDF 30-

26  31, Exs. A-B.)

On May 12, 2006, defendant Cox met with plaintiff for a follow-up appointment regarding his lower back pain.  Defendant Cox informed plaintiff that the MAR Committee denied his request for an MRI and determined that plaintiff should see a physical therapist first.  Defendant Cox noted that plaintiff had just seen a physical therapist two days earlier on May 10, 2006.  Defendant Cox requested that plaintiff use the exercises he learned for a period of one month.  He told plaintiff that he would then be re-ducated for a follow-up visit.  He also increased plaintiff's Naprosyn prescription from 400 mg to 500 mg.  (Defs.' SUDF 32-37, Exs. A-B.)

On May 22, 2006, plaintiff submitted a health care services request form complaining of lower back pain.  On May 26, 2006, defendant Flaherty examined plaintiff at a triage appointment.  Defendant Flaherty gave plaintiff Naproxen for pain but did not refer plaintiff for an appointment with a staff physician because plaintiff had one scheduled for June 5, 2006.  On June 11, 2006, plaintiff submitted another health care services request form complaining of lower back pain.  On June 15, 2006, defendant Flaherty examined plaintiff at a triage appointment.  She gave plaintiff more Naproxen for pain at that time but did not refer plaintiff for an appointment with a staff physician because he had one scheduled for June 20, 2006.  (Defs.' SUDF 38-45, Exs. A & D.)

On June 21, 2006, defendant Cox met with plaintiff for a follow-up appointment regarding his lower back pain.  Defendant Cox noted that plaintiff's chart revealed that he had refused at least one appointment for physical therapy.  Defendant Cox called the physical therapist and asked to refer plaintiff back to him again.  Defendant Cox informed plaintiff that if he was cooperative with the physical therapist but his back pain continued it might be possible to resubmit another request for an MRI of his spine.  Defendant Cox prescribed plaintiff Motrin for pain and re-ducated him to return for a follow-up appointment in two months.  (Defs.' SUDF 46-50, Exs. A-B.)

/////

In August 2006, defendant Cox left HDSP and was assigned to the California Correctional Center.  He did not treat plaintiff after the June 21, 2006, appointment.  According to defendant Cox, at no time did he intentionally or knowingly cause plaintiff any pain, suffering, injury, or harm, nor did he delay, intentionally or unintentionally, care or treatment for plaintiff.  During the times defendant Cox examined plaintiff and reviewed his medication record he ensured that plaintiff received appropriate medical treatment.  (Defs.' SUDF 51-55, Ex. B.)

On July 26, 2006, the HDSP Inmate Appeals Office received plaintiff's request for a Reasonable Modification or Accommodation Request, Log No. 06-1620, requesting an MRI so he "can get the appropriate treatment."  At the first level of review, Dr. Svendsen interviewed plaintiff to discuss his request and to discuss the severity of his lower back pain.  He reviewed plaintiff's Unit Health Record and plaintiff's x-ray report.  He informed plaintiff that an MRI was not a form of treatment and that he did not recommend this type of diagnostic procedure for plaintiff at this point in time.  He informed plaintiff that the preferred methods of treatment for his lower back pain were exercise and medication.  He instructed plaintiff on exercises to perform to strengthen his back muscles and prescribed him Ibuprofen for pain and Parafor Forte for muscle spasms.  He informed plaintiff he would re-ducat him in three months for further evaluation.  (Defs.' SUDF 56-62, Ex. A.)

On August 11, 2006, plaintiff submitted a health care services request form complaining of lower back pain.  On August 16, 2006, defendant Flaherty examined plaintiff at a triage appointment.  Defendant Flaherty gave plaintiff Naproxen for pain and referred him for an appointment with a staff physician, even though he already had an appointment scheduled for August 17, 2006.  On August 17, 2006, plaintiff again refused physical therapy treatment. (Defs.' SUDF 63-67, Exs. A & D.)

On August 27, 2006, plaintiff submitted a health care services request form complaining of lower back pain.  On August 29, 2006, defendant Flaherty examined plaintiff at a triage appointment and again gave him more Naproxen for pain.  Defendant Flaherty again

1    referred plaintiff for an appointment with a staff physician, even though he already had one

2    scheduled for November 2, 2006.  (Defs.' SUDF 68-71, Exs. A & D.)

3              On October 15, 2006, plaintiff submitted another health care services request form

4    complaining of lower back pain.  Defendant Flaherty noted that plaintiff was scheduled to see a

5    doctor on October 27, 2006, and on November 2, 2006.  On October 23, 2006, plaintiff

6    submitted yet another health care services request form.  Defendant Flaherty again noted that

7    plaintiff  was scheduled to see a doctor on October 27, 2006, and November 2, 2006.  (Defs.'

8    SUDF 72-75, Ex. A.)

9              According to defendant Flaherty, at no time did she intentionally or knowingly

10   cause plaintiff any pain, suffering, injury, or harm, nor did she delay, intentionally or

11   unintentionally, care or treatment for plaintiff.  At no time during any of defendant Flaherty's

12   visits with plaintiff did she believe that his back pain required urgent or emergency care.  During

13   the times defendant Flaherty examined plaintiff, she ensured that he received appropriate medical

14   attention according to his presenting symptoms.  (Defs.' SUDF 76-79, Ex. D.)

15             On October 23, 2006, Dr. Roche, Chief Medical Officer at HDSP, reviewed

16   plaintiff's inmate appeal at the second level of review.  He denied plaintiff's request for an MRI,

17   noting that Dr. Svendsen had evaluated plaintiff, prescribed him medication, and scheduled him

18   for a follow-up appointment in November.  (Defs.' SUDF 80-81, Ex. A.)

19             On November 2, 2006, defendant James examined plaintiff.  Plaintiff complained

20   of back pain and requested medication.  During the examination, defendant James observed no

21   tenderness in plaintiff's lower back.  Plaintiff was able to bend over until his fingertips were

22   three inches from his toes.  In addition, plaintiff presented no neurological or other symptoms

23   that indicated the necessity for an MRI for his back.  Dr. James prescribed plaintiff

24   Chlorzoxazone, an anti-spasm medication, and gave him abdominal and lumbar strengthening

25   exercises to perform to strengthen his core muscles.  (Defs.' SUDF 82-86, Exs. A & C.)

26   /////

1    On March 22, 2007, nurse practitioner David met with plaintiff, and plaintiff

2  again requested an MRI for his back.  When she spoke to defendant James about plaintiff's

3  request, defendant James explained that an MRI was not medically indicated for plaintiff's

4  symptoms.  (Defs.' SUDF 87-88, Ex. A.)

5    On March 28, 2007, defendant James examined plaintiff due to an outbreak of

6  sores on his lips.  During that examination, plaintiff complained about continued back pain and

7  asked when he was going to have an MRI since nurse David told him he was going to have one.

8  Defendant James did not conduct a physical examination of plaintiff's back at this appointment

9  because he believed that nurse David had already done so.  Defendant James explained to

10  plaintiff that his findings did not indicate that an MRI was necessary and again instructed him to

11  perform regular abdominal and back strengthening exercises.  (Defs.' SUDF 89-92, Exs. A & C.)

12    According to defendant James, at no time did he intentionally or knowingly cause

13  plaintiff any pain, suffering, injury, or harm, nor did he delay, intentionally or unintentionally,

14  care or treatment for plaintiff.  In defendant James' professional opinion, refusing to schedule an

15  MRI for plaintiff's back did not subject him to any risk of harm.  During the times defendant

16  James examined plaintiff and reviewed his medication record, he ensured that plaintiff received

17  appropriate medical treatment.  (Defs.' SUDF 93-96, Ex. C.)

18    In March 2009, plaintiff was transferred to Centinela State Prison.  Due to his

19  long history of complaints of back pain, Dr. Shiller, one of plaintiff's treating physicians, ordered

20  an MRI of his spine, which took place on April 14, 2009, at the Centinela State Prison Radiology

21  Department in Imperial, California.  The radiologist observed a 3 mm broad-based disc bulge

22  demonstrated at L4-5 with no significant neuroforaminal stenosis.  Based on the MRI findings,

23  the medically appropriate treatment for plaintiff's back was determined to be the use of pain

24  medication and physical therapy.  (Defs.' SUDF 97-99, Exs. E-F.)

25    Dr. Shiller prescribed plaintiff pain medication for his back and referred him to

26  physical therapy.  In Dr. Shiller's professional opinion, plaintiff's MRI findings would not have

13

1  changed the medical treatment he received at HDSP.  In fact, Dr. Shiller believes that an MRI

2  was medically unnecessary at the time.  In addition, in Dr. Shiller's view, the fact that an MRI of

3  plaintiff's back was not performed earlier did not subject him to any additional risk of harm, did

4  not cause any additional harm to his back, and did not delay the appropriate treatment for his

5  back.  According to Dr. Shiller, plaintiff received medically appropriate treatment, including the

6  use of pain medication and physical therapy, for his presenting symptoms at HDSP.  In this

7  regard, Dr. Shiller opines that the medical treatment plaintiff received, and any refusal to

8  schedule an MRI, was medically reasonable and did not deviate from the reasonable standard of

9  care.  (Defs.' SUDF 100-107, Exs. E-F.)

10  II.  Defendants' Arguments

11        Defense counsel argues that the defendants are entitled to summary judgment in

12  their favor on plaintiff's Eighth Amendment claims because there is no evidence that they were

13  deliberately indifferent to plaintiff's medical needs.  Defense counsel also argues that the

14  defendants are entitled to qualified immunity.  (Defs.' Mem. of P. & A. at 10 & 14-15.)

15        First, defense counsel contends there is no evidence before the court that

16  defendant Cox purposefully ignored or failed to respond to plaintiff's pain or medical needs, or

17  delayed his treatment.  In fact, the evidence establishes that when defendant Cox first saw

18  plaintiff for complaints of lower back pain, he prescribed plaintiff pain medication, ordered an x-

19  ray of his back, instructed plaintiff regarding the use of Motrin, and encouraged him to take

20  walks and hot showers.  In addition, when defendant Cox received plaintiff's x-ray results and

21  saw that the radiologist believed an MRI might be helpful for further evaluation, he ordered an

22  MRI for plaintiff and prescribed him Naprosyn, an anti-inflammatory drug used to treat pain.

23  Although the MAR Committee determined that the better course of treatment for plaintiff was

24  physical therapy, that does not equate to deliberate indifference by defendant Cox, particularly

25  because defendant Cox voted in favor of plaintiff receiving the MRI at that time.  Finally,

26  defense counsel notes that even after defendant Cox informed plaintiff of the MAR Committee's

14

1   decision, he encouraged plaintiff to cooperate with the physical therapist because it might be

2   possible to request another MRI for plaintiff at a later date.  (Defs.' Mem. of P. & A. at 10-11.)

3            Second, defense counsel contends the evidence shows that defendant James was

4   not deliberately indifferent to plaintiff's medical needs and instead treated plaintiff according to

5   his presenting symptoms.  For example, counsel contends that there is no evidence that defendant

6   James was aware of and ignored any risk to plaintiff by not ordering an MRI of plaintiff's back.

7   In fact, in defendant James' professional opinion, declining to schedule plaintiff for an MRI did

8   not subject plaintiff to any risk of harm.  In any event, by the time defendant James had examined

9   plaintiff in November 2006, Dr. Svendsen had seen him and already told plaintiff that an MRI

10  was not recommended for his symptoms and that the preferred methods of treatment for his back

11  were exercise and pain medication.  Based on defendant James' evaluation of plaintiff's

12  condition and symptoms, he had reached the same conclusion regarding the proper course of

13  treatment.  Counsel contends that plaintiff's complaint represents nothing other than a mere

14  disagreement with defendant James' medical opinion, which cannot support a claim of

15  deliberate indifference.  (Defs.' Mem. of P. & A. at 12-13.)

16           Third, counsel contends that the evidence shows that defendant Flaherty was not

17  deliberately indifferent to plaintiff's medical needs but rather treated plaintiff according to his

18  symptoms and within the scope of her position.  Specifically, counsel contends that as a triage

19  RN, defendant Flaherty was limited as to what actions she could take upon examining an inmate.

20  Counsel notes that while plaintiff speculates that defendant Flaherty had the ability to refer him

21  to an outside facility or specialist, the evidence shows that she was only able to call the on-call

22  physician if there was an emergency.  In this case, she never believed that plaintiff's complaints

23  of back pain constituted an emergency.  Moreover, counsel contends that in virtually every visit

24  with plaintiff, defendant Flaherty provided him with pain medication according to his complaints

25  and referred plaintiff for an appointment with a doctor or checked to see if he already had a

26  doctor's appointment scheduled.  Defendant Flaherty had no control over whether plaintiff

1   actually saw a staff physician.  Counsel points out that she did not schedule plaintiff's

2   appointments with doctors since other prison personnel scheduled such appointments.  (Defs.'

3   Mem. of P. & A. at 13.)

4              Defense counsel maintains that even if plaintiff had received the MRI he

5   requested at the times he requested it, his medical treatment at HDSP would not have been any

6   different.  In this regard, counsel contends that plaintiff eventually received an MRI in 2009, but

7   his course of treatment, pain medication and exercise, remained the same as it was at HDSP.

8   Counsel contends that since there is no evidence that plaintiff's treatment would have changed

9   had he received an MRI, he cannot show that any failure to treat him resulted in further

10  significant injury or the unnecessary wanton infliction of pain.  (Defs.' Mem. of P. & A. at 13-

11  14.)

12             Finally, defense counsel argues that each of the defendants are entitled to qualified

13  immunity.  Specifically, counsel contends that the evidence in this case does not establish that the

14  defendants violated plaintiff's constitutional rights.  In addition, counsel contends that a

15  reasonable person in the defendants' respective positions could have believed that their conduct

16  was lawful.  (Defs.' Mem. of P. & A. at 14-15.)

17  III.  Plaintiff's Opposition

18             Plaintiff's opposition to defendants' motion for summary judgment is supported

19  by copies of his medical records, inmate appeals, and health care services request forms.

20             Plaintiff argues that the defendants were deliberately indifferent to his chronic

21  lower back pain for two years while he was housed at HDSP.  Specifically, plaintiff contends that

22  the defendants delayed his medical treatment, denied him an MRI on three occasions, and only

23  gave him over-the-counter pain medication and referrals to physical therapy, which they knew

24  failed to relieve his pain or help in the treatment of his injury.  Plaintiff notes that he did not

25  receive an MRI until he arrived at Centinela State Prison even though he repeatedly submitted

26  health care services request forms at HDSP.  (Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 5-7, 13-

1  20 & Ex. A.)

2          Plaintiff also argues that, contrary to defendants' position, the defendants' failure

3  to perform an MRI on his back and to refer him to an outside specialist did cause him further

4  significant injury and the unnecessary wanton infliction of pain because his injury worsened and

5  spread to his hips and legs.  In fact, plaintiff contends that only after he received his MRI did he

6  learn that he had a bulging disc in his lower back in addition to narrowing between his L4 and L5

7  vertebrae.  In plaintiff's view, he could have received adequate and more appropriate treatment,

8  including a steroid injection or surgery, had he received his MRI earlier as ordered by defendant

9  Cox on April 19, 2006, Nurse David on March 22, 2007, and one Dr. Swingle at HDSP on

10 August 20, 2007.  Instead, plaintiff contends, as a result of defendants inadequate care he

11 continues to suffer from chronic lower back pain.  (Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 2,

12 6-12 & Exs. F-G.)

13 IV.  Defendants' Reply

14          In reply, defense counsel argues that plaintiff has failed to offer any evidence

15 sufficient to establish a disputed material fact in this case.  Counsel contends that the

16 unequivocal evidence shows that none of the defendants purposefully ignored or failed to

17 respond plaintiff's medical needs.  Counsel notes that plaintiff states in his opposition that he had

18 three orders for an MRI, but he never received them, causing him to suffer unnecessary back

19 pain.  However, defense counsel argues that plaintiff's argument is based on his own speculation

20 and unqualified medical opinion.  Counsel contends that the evidence presented to the court by

21 the defendants demonstrates that plaintiff's medical treatment would not have been any different

22 even if he had received the MRI's he requested because the appropriate treatment for his back is

23 pain medication and physical therapy.  (Defs.' Reply at 1-4.)

24          Plaintiff attempts to dispute defendants' evidence regarding his need for an MRI

25 by stating that he "discussed" receiving a steroid injection or surgery for his back presumably

26 with Dr. Shiller.  However, counsel contends that any of Dr. Shiller's statements, other than his

17

signed declaration submitted in support of defendants' motion for summary judgment and his

authenticated medical records notes, is inadmissible hearsay.  Moreover, counsel reiterates that,

in Dr. Shiller's declaration, he opines that the treatment defendants gave plaintiff at HDSP,

including the use of pain medication and physical therapy, was the same treatment plaintiff

would have received had an MRI been done earlier.  In this regard, the absence of an MRI of

plaintiff's back did not subject him to any additional risk of harm, did not cause any additional

harm to his back, and did not delay the appropriate medical treatment of his back condition.

Defendants contend that the medical treatment plaintiff received at HDSP, including any refusal

to schedule an MRI, was medically reasonable and did not deviate from the reasonable standard

of care.  (Defs.' Reply at 4-6.)

## ANALYSIS

I. Plaintiff's Serious Medical Needs

The parties do not dispute and undersigned finds that based upon the evidence

presented by the parties in connection with the pending motion a reasonable juror could conclude

that plaintiff's chronic lower back pain constitutes an objective, serious medical need.  See

McGuckin, 974 F.2d at 1059-60 ("The existence of an injury that a reasonable doctor or patient

would find important and worthy of comment or treatment; the presence of a medical condition

that significantly affects an individual's daily activities; or the existence of chronic and

substantial pain are examples of indications that a prisoner has a 'serious' need for medical

treatment."); see also Canell v. Bradshaw, 840 F. Supp. 1382, 1393 (D. Or. 1993) (the Eighth

Amendment duty to provide medical care applies "to medical conditions that may result in pain

and suffering which serve no legitimate penological purpose.").  Specifically, plaintiff's largely

undisputed medical history, as well as the observations and treatment recommendations by the

defendants, other HDSP medical personnel, and Dr. Shiller compel the conclusion that plaintiff's

medical condition, if left untreated, could result in "further significant injury" and the

"unnecessary and wanton infliction of pain."  McGuckin, 974 F.2d at 1059.  Accordingly,

1 defendants' motion for summary judgment hinges on whether, based upon the evidence before

2 the court, a rationale jury could conclude that the defendants responded to plaintiff's serious

3 medical needs with deliberate indifference. Farmer, 511 U.S. at 834; Estelle, 429 U.S. at 106.

4 II. Defendants' Response to Plaintiff's Serious Medical Needs

5       The court finds that the defendants have borne their initial responsibility of

6 demonstrating that there is no genuine issue of material fact with respect to the adequacy of the

7 medical care provided to plaintiff. First, with respect to defendant Cox, a medical doctor, the

8 evidence in this case demonstrates that he met with plaintiff on four occasions due to plaintiff's

9 complaints regarding his back pain. On January 6, 2006, Dr. Cox examined plaintiff and noticed

10 that he had some minimal tenderness in his lumbrosacral area. Based on the examination, Dr.

11 Cox prescribed plaintiff Motrin for pain, ordered a spinal x-ray, instructed plaintiff regarding the

12 use of Motrin, and encouraged plaintiff to take walks and hot showers. (Defs.' Exs. A-B.)

13       On April 19, 2006, Dr. Cox met with plaintiff to discuss the results of the x-ray of

14 his back. He told plaintiff that the radiologist who reviewed the x-ray noted that there was mild

15 intervertebral disc space narrowing present at his L4 and L5 vertebrae and that an "MRI may be

16 helpful for further evaluation as clinically indicated." Dr. Cox ordered an MRI of plaintiff's

17 spine and prescribed him Naprosyn, an anti-inflammatory drug used to treat pain. At that time,

18 the MAR Committee reviewed and approved all MRI requests by staff physicians. On May 1,

19 2006, the majority of the MAR Committee voted to deny Dr. Cox's request for an MRI and

20 suggested that plaintiff first see the physical therapy department for treatment. Dr. Cox voted in

21 favor of plaintiff receiving the MRI. (Defs.' Exs. A-B.)

22       On May 12, 2006, Dr. Cox met with plaintiff for a follow-up appointment and

23 informed him that the MAR Committee denied his request for an MRI and suggested that

24 plaintiff see a physical therapist first. Plaintiff had seen a physical therapist two days earlier and

25 claimed that it had not relieved his discomfort and that Naproxyn was not adequate to control his

26 pain. Dr. Cox recommended that plaintiff use the exercises he learned for a period of one month.

1   He also increased plaintiff's Naprosyn from 400 mg to 500 mg and told plaintiff that he would be

2   re-ducated for a follow-up visit.  (Defs.' Exs. A-B.)

3           On June 21, 2006, Dr. Cox met with plaintiff for a follow-up appointment.

4   Plaintiff's chart revealed that he had refused a physical therapy appointment, so Dr. Cox called

5   the physical therapist and asked to refer plaintiff back to him again.  Dr. Cox informed plaintiff

6   that if he was cooperative with the physical therapist but his back pain continued it would be

7   possible to resubmit another request for an MRI of his spine.  Dr. Cox prescribed plaintiff Motrin

8   for pain and re-ducated him to return for a follow-up appointment in two months.  In August

9   2006, however, Dr. Cox left HDSP and did not treat plaintiff after the June 21, 2006,

10  appointment.  (Defs.' Exs. A-B.)

11          Next, with respect to defendant James, a medical doctor, the evidence in this case

12  demonstrates that he met with plaintiff on two occasions.  On November 2, 2006, he examined

13  plaintiff for complaints regarding back pain and noticed that there was no tenderness in

14  plaintiff's lower back and that he was able to bend over until his fingertips were three inches

15  from his toes.  Plaintiff presented no neurological or other symptoms that indicated the necessity

16  for an MRI for his back.  Accordingly, Dr. James prescribed Chlorzoxazone, an anti-spasm

17  medication, and gave plaintiff abdominal and lumbar strengthening exercises to perform to

18  strengthen his core muscles.  (Defs.' Exs. A & C.)

19          On March 28, 2007, Dr. James examined plaintiff for an outbreak of sores on his

20  lips.  During that examination, plaintiff complained about continued back pain and asked when

21  he was going to have an MRI since nurse David told him he was going to have one.  Dr. James

22  explained to plaintiff that his findings did not indicate that an MRI was necessary and again

23  instructed plaintiff to perform regular abdominal and back strengthening exercises.  (Defs.' Exs.

24  A & C.)

25          Finally, with respect to defendant Flaherty, an RN, the evidence in this case

26  demonstrates that she met with plaintiff on numerous occasions for complaints regarding his

1  back pain.  Specifically, she examined plaintiff at triage appointments on January 26, 2006, April

2  8, 2006, May 26, 2006, June 15, 2006, August 16, 2006, and August 29, 2006.  During these

3  appointments, nurse Flaherty gave plaintiff Naproxen for pain and advised him to submit

4  additional health care services request forms if the Naproxen did not help.  She also referred him

5  for appointments with staff physicians even at times when he already had an appointment

6  scheduled.  At no time, however, did nurse Flaherty believe that plaintiff's back pain required

7  urgent or emergency care.  (Defs.' Ex. D.)

8         As a triage RN, defendant Flaherty could provide an inmate with over-the-counter

9  medications and refer him to a clinic physician, call the on-call physician for immediate care or

10  advice if the symptoms presented were urgent or emergent, or simply provide the inmate with

11  over-the-counter medication and tell him to submit a new health care services request form if the

12  symptoms did not improve.  The evidence before the court establishes that Nurse Flaherty could

13  not refer inmates to outside physicians or facilities.  She also had no control over whether an

14  inmate actually saw a staff physician.  She did not schedule appointments for inmates to see staff

15  physicians.  (Defs.' Ex. D.)

16         Given the evidence submitted by defendants Cox, James, and Flaherty, the burden

17  shifts to plaintiff to establish the existence of a genuine issue of material fact with respect to his

18  deliberate indifference claims.  As noted above, to demonstrate a genuine issue, the opposing

19  party "must do more than simply show that there is some metaphysical doubt as to the material

20  facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the

21  nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation

22  omitted).

23         The court has considered plaintiff's opposition to the pending motion for

24  summary judgement and his verified complaint.  On defendants' motion for summary judgment,

25  the court is required to believe plaintiff's evidence and draw all reasonable inferences from the

26  facts before the court in plaintiff's favor.  Drawing all reasonable inferences in plaintiff's favor,

1    the court concludes that plaintiff has not submitted sufficient evidence to create a genuine issue

2    of material fact with respect to his claim that the defendants responded to his serious medical

3    need with deliberate indifference.  See Farmer, 511 U.S. at 834; Estelle, 429 U.S. at 106.

4           Specifically, plaintiff claims that the defendants were deliberately indifferent to

5    his medical needs because they refused to authorize an MRI or refer him to a lower back

6    specialist.  However, the evidence before the court in this case demonstrates that Dr. Cox did in

7    fact order an MRI for plaintiff, but the MAR Committee rejected his request.  Dr. Cox, a member

8    of the MAR Committee, also voted in favor of plaintiff receiving the diagnostic test at that time.

9    In addition, with respect to defendant Nurse Flaherty, the evidence in this case demonstrates that

10   she could not refer plaintiff to outside physicians or facilities.  (Defs.' Exs. A-B & D.)

11          Moreover, as a matter of law, a mere difference of opinion between a prisoner and

12   prison medical staff as to the proper course of medical care does not give rise to a § 1983 claim.

13   See Estelle, 429 U.S. at 107 ("A medical decision not to order an X-ray, or like measures, does

14   not constitute cruel and unusual punishment."); Toguchi, 391 F.3d at 1058; Jackson, 90 F.3d at

15   332; Fleming v. Lefevere, 423 F. Supp. 2d 1064, 1070 (C.D. Cal. 2006) ("Plaintiff's own opinion

16   as to the appropriate course of care does not create a triable issue of fact because he has not

17   shown that he has any medical training or expertise upon which to base such an opinion.").  In

18   this regard, plaintiff's disagreement with defendants Cox, James, and Flaherty as to the

19   appropriate course of diagnosis and treatment, without more, is insufficient to survive

20   defendants' motion for summary judgment.

21          Here, plaintiff has tendered no competent evidence demonstrating that the course

22   of diagnosis and treatment the defendants chose was medically unacceptable under the

23   circumstances or that any delay in his being administered a MRI ultimately caused him harm.  To

24   be sure, Dr. Shiller at Centinela State Prison ultimately ordered an MRI of plaintiff's spine in

25   2009.  However, Dr. Shiller's decision in that regard represents at most a difference of medical

26   opinion between doctors, which also does not give rise to a § 1983 claim.  See, e.g., Toguchi,

391 F.3d at 1059-60 ("Dr. Tackett's contrary view was a difference of medical opinion, which cannot support a claim of deliberate indifference."); Sanchez, 891 F.2d at 242 (difference of opinion between medical personnel regarding the need for surgery does not amount to deliberate indifference to a prisoner's serious medical needs).  Moreover, Dr. Shiller has submitted a declaration signed under penalty of perjury in support of defendants' motion for summary judgment.  Therein, he declares that, based on the MRI findings, the medically appropriate treatment for plaintiff's back is the use of pain medication and physical therapy – the same course of treatment defendants prescribed for plaintiff.  Dr. Shiller further declares that, in his professional opinion, an MRI was medically unnecessary when plaintiff  was housed at HDSP, and the absence of an MRI did not subject him to any additional risk of harm, did not cause him any additional harm to his back, and did not delay the appropriate treatment for his back condition.  Dr. Shiller maintains that plaintiff received medically appropriate treatment for his presenting symptoms at HDSP.  (Defs.' Ex. E.)

Finally, plaintiff has provided this court with no competent evidence demonstrating that the defendants chose their course of diagnosis and treatment in conscious disregard of an excessive risk to plaintiff's health.  In fact, the volume and content of plaintiff's medical records as well as the frequency of his medical visits with the defendants contradicts plaintiff's subjective belief that they were deliberately indifferent to his medical needs.  As noted above, during Dr. Cox's visits with plaintiff, he examined plaintiff's back, ordered him various diagnostic tests, prescribed plaintiff different types of pain medication and increased the dosage of the medication when plaintiff complained that it was insufficient.  He also made efforts to ensure that plaintiff could continue physical therapy for his back and indicated that he was willing to submit another request for an  MRI if plaintiff continued to experience back pain. (Defs.' Exs. A-B.)  Similarly, during Dr. James' visits with plaintiff, he examined plaintiff's back, prescribed him anti-spasm medication for pain, and gave him abdominal and lumbar strengthening exercises to perform in order to strengthen his core muscles.  He also explained to

1    plaintiff that his findings did not indicate that an MRI was necessary and instructed plaintiff to

2    continue performing regular abdominal and back strengthening exercises. (Defs.' Exs. A & C.)

3    Finally, during defendant Nurse Flaherty's visits with plaintiff, she examined his back, gave him

4    Naproxen for pain, and referred him for appointments with staff physicians even when he already

5    had such appointments scheduled. In this regard, the evidence establishes that defendant Nurse

6    Flaherty did all she could do for plaintiff within the boundaries of her position. (Defs.' Exs. A &

7    D.)

8            Accordingly, for all of the foregoing reasons, the court concludes that defendants

9    Cox, James, and Flaherty were not deliberately indifferent to plaintiff's serious medical needs

10   and are entitled to summary judgment in their favor with respect to plaintiff's Eighth

11   Amendment claims.[1]

12                          **CONCLUSION**

13           Accordingly, IT IS HEREBY RECOMMENDED that:

14           1. Defendants' February 19, 2010 motion for summary judgment (Doc. No. 38)

15   be granted; and

16           2. This action be closed.

17           These findings and recommendations are submitted to the United States District

18   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-

19   one days after being served with these findings and recommendations, any party may file written

20   objections with the court and serve a copy on all parties. Such a document should be captioned

21   "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections

22   shall be served and filed within fourteen days after service of the objections. The parties are

23   /////

24   _____

25        [1]  In light of these findings and recommendations concluding that the defendants are
     entitled to summary judgment on the merits of plaintiff's claims, the court declines to address
     defense counsel's alternative argument that the defendants are entitled to summary judgment in

26   their favor based upon qualified immunity.

advised that failure to file objections within the specified time may waive the right to appeal the

District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: April 16, 2010.

DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:9
meha1089.57